**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

**JOHN HOWARD**                                                    **PLAINTIFF**

**v.**                                                       **CAUSE NO. 1:12CV361-LG-JMR**

**TRANSOCEAN UK, LTD, ET AL.**                            **DEFENDANTS**

**<u>MEMORANDUM OPINION AND ORDER
GRANTING MOTION FOR SUMMARY JUDGMENT</u>**

BEFORE THE COURT is the Motion [44] for Summary Judgment filed by defendants Transocean UK Limited, Transocean Offshore International Ventures Limited, and Transocean Drilling Offshore S.a.r.l. (collectively "Transocean"). Transocean argues that Howard, a Longshore and Harbor Workers' Compensation Act employee, cannot establish a basis for liability against it for injuries he suffered while working on the vessel DEEPWATER NAVIGATOR. Howard has responded in opposition, and Transocean has replied. After due consideration of the submissions and the relevant law, it is the Court's opinion that Howard has not shown a question of material fact regarding whether Transocean violated a duty it owed to him. Accordingly, Transocean's Motion for Summary Judgment will be granted.

FACTS

According to the complaint, Howard was employed by Signal International working on the M/V DEEPWATER NAVIGATOR, owned and operated by Transocean. Howard injured his "ankle, foot and other parts of his body" when he fell while walking across boards to get from one room of the vessel to another.

(Compl. 2 (¶¶IV, V), ECF No. 1). Howard testified that he had been using the scaffold boards, which were between a foot and a half and three feet from the deck of the vessel, for two or three weeks prior to his accident. (Def. Mot. Summ. J. Ex. D 98, ECF No. 44-4; Ex. G 51, 56, ECF No. 44-7). The accident occurred when the scaffold "failed on me, and slid. And so therefore that means it wasn't connected on the other end and they didn't check it properly." (*Id*. Ex. D at 130-31). He alleges his injuries are attributable to Transocean's negligence and seeks compensatory and punitive damages.

## DISCUSSION

The parties agree that Howard is an "employee" under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 901, *et seq*., and therefore in order to establish liability against Transocean, he must show that it violated one of the three duties to longshoremen owed by the vessel owner. The three duties are: (1) a turnover duty, (2) a duty to exercise reasonable care in the areas of the ship under the active control of the vessel, and (3) a duty to intervene. *Kirksey v. Tonghai Mar.*, 535 F.3d 388, 391 (5th Cir. 2008). These duties are owed to a longshoreman like Howard, who was employed by an independent contractor doing repair and maintenance work on a vessel. *Hill v. Texaco*, 674 F.2d 447, 451 (5th Cir. 1982).

Howard concedes that there is no basis for finding that Transocean violated the turnover duty. He argues the contract and course of dealing between the parties demonstrates that Transocean maintained active control over the safety aspects of Signal's work, and while doing so, Tansocean violated the other two

duties.

### The Active Control Duty:

Under the active control duty, the vessel can be held liable if it actively participates in the stevedoring operations and negligently injures a longshoreman. *Scindia Steam Nav. Co., Ltd. v. De Los Santos*, 451 U.S. 156, 166-67 (1981). The active control duty also requires the vessel to "exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation." *Id*. "This duty recognizes that although a vessel owner no longer retains the primary responsibility for safety in a work area turned over to an independent contractor, no such cession results as relates to areas or equipment over which the vessel's crew retains operational control." *Manuel v. Cameron Offshore Boats, Inc.*, 103 F.3d 31, 34 (5th Cir. 1997). The duty applies to the vessel's responsibilities after the contractor's work is underway. Once the work starts, the vessel owner has no general duty to monitor the operation, "absent contract provisions, positive law, or custom to the contrary," and it may rely on the contractor's judgment that equipment is reasonably safe for continued use during the work. *See Scindia*, 451 U.S. at 172.

The Fifth Circuit has stated that "[t]o determine whether a vessel owner retains active control over the contractor's work, we generally consider 'whether the area in question is within the contractor's work area, whether the work area has been turned over to the contractor, and whether the vessel owner controls the

methods and operative details of the stevedore's work.'" *Hudson v. Schlumberger Tech. Corp.*, 452 F. App'x 528, 535 (5th Cir. 2011) (quoting *Dow v. Oldendorff Carriers GMBH & Co.,* 387 F. App'x. 504, 507 (5th Cir. 2010); and citing *Fontenot v. United States*, 89 F.3d 205, 208 (5th Cir.1996)).

There is no question here that the board Howard slipped on was part of scaffolding built by Signal in Signal's work area - the forward machinery room of the vessel. Howard testified that his own Signal foreman told him to haul scrap from the room, and no one from Transocean was supervising the work. (Def. Mot. Summ. J. Ex. D 95-96, ECF No. 44-4). He argues that Transocean maintained control of the scaffolding he walked on to do the work. He testified that "Signal built the scaffolds, but Transocean had oversight," (Pl. Resp. Ex. B 42-43, ECF No. 47-2; Ex. C 1, ECF No. 47-3), and that "[Transocean] checked the tacks sometimes and had them make adjustments here and there." (*Id.* Ex. B at 43). He testified generally that:

> Transocean had a different type of role as far as overseeing the work. They were engaged to a point. They would look over things, inspect things, especially safety things. They had to give us permits to do the actual work. We had to have a hot work permit. When we were hooking up a lot of electrical things, they had to have an electrical permit. They would check the scaffolds to make sure they were tacked and built correctly.

(*Id*. at 41). Howard also testified in an affidavit that "Transocean employed a project manager and a safety manager, as well as a crew of nearly one hundred personnel who, while not supervising Mr. Howard or his Signal International LLC

co-employees directly, did maintain control of the DEEPWATER NAVIGATOR and monitored safety operations aboard the vessel." (*Id*. Ex. C 1, ECF No. 47-3).

In opposition, Transocean has submitted a number of affidavits.  The first is from a Transocean assistant project manager who states that Transocean had relinquished control of the area in which Signal performed its work to Signal, and did not tell Signal craftsmen what to do or supervise Signal employees.  (Def. Mot. Summ. J. Ex. A, ECF No. 44-1).  The second, third and fourth are from a pipe department superintendent, a pipe department general foreman, and Howard's foreman, all employed by Signal, who state that they supervised or managed Howard.  (Def. Mot. Summ. J. Ex. B, ECF No. 44-2; Ex. C, ECF No. 44-3; Ex. H, ECF No. 44-8).  They each state that Transocean relinquished control of the forward machinery space to Signal, and never instructed Signal employees how to perform their work.  They also state that Signal personnel installed the scaffold boards as a safe, even walking surface for Signal personnel in order to avoid them having to step over angle irons or i-beams that were part of the vessel's superstructure.  Signal inspected the scaffolding and certified it safe.

Transocean also submits a copy of the permit issued to Signal allowing Signal to perform "Hot Work," "Elevated scaffold work (above 5 ft)," and "Other MATERIAL HANDLING" in the forward machinery room.  (Def. Reply Ex. A-1, ECF No. 52-2).  It further submitted a copy of the Pipe Job Planning Outline/Risk Assessment for the day of Howard's accident, showing that the scaffold was inspected by "Tool [illegible] & Crew" and signed by Signal employees, including

Howard.  (*Id*. Ex. A-2, ECF No. 52-3).  Transocean contends that these documents show that it had turned control of the details of the work in the forward machinery room over to Signal, and Signal had acted to ensure the safety of the scaffolding in order to perform the work.

The evidence presented does not support Howard's contention that Transocean took on and violated the active control duty.  Facts, such as the vessel owner having employees on the vessel to evaluate the general scope of work being performed, inspecting for unsafe conditions, and having an obligation to report any unsafe condition "do not automatically lead to a finding of active control under *Scindia*."  *Cole v. Noble Drilling Corp.*, No. 1:05cv479-HSO-JMR, 2007 WL 2475944, *12 (S.D. Miss. Aug. 28, 2007).  The mere presence of the representatives of a vessel aboard a ship to inspect the work being completed and check on the progress of the contractor's work does not trigger the active control duty.  *Dow*, 387 F. App'x at 507; *Fontenot v. United States,* 89 F.3d at 208; *Futo v. Lykes Bros. S.S. Co.,* 742 F.2d 209, 211 (5th Cir. 1984).  And although "the captain of the vessel retains the ultimate authority to make decisions about the . . . safety of those aboard, this overarching authority is not the equivalent of "active control" for purposes of the owner's duties under *Scindia*."  *Fontenot v. McCall's Boat Rentals, Inc*., 227 F. App'x 397, 403 (5th Cir. 2007); *see also Hudson*, 452 F. App'x at 534-35.

Howard argues that his deposition testimony is evidence that Transocean exercised some degree of control of the details of Signal's work, because he testified

that Transocean checked the scaffolding for safety during Signal's operations and directed Signal to make changes when necessary.  In the Court's opinion, however, these actions by Transocean arise from the owner's authority to inspect for unsafe conditions and to make decisions about the safety of those aboard, which as set out above are not the equivalent of active control under *Scindia*.  The Fifth Circuit has found active control in a case where 1) the work was closely supervised, with the vessel owner remaining with the worker for an entire day and instructing him how to perform a weld; 2) the owner told the worker when to stop and start work due to weather; 3) the owner provided deckhands to keep the work area clean.  *Romero v. Cajun Stabilizing Boats, Inc.*, 307 F. App'x 849, 852 (5th Cir. 2009).  The circumstances of this case are very different and do not indicate that Transocean retained active control of Signal's work.

In addition, the contractual provisions pointed out by Howard do not show that Transocean retained control over Signal's work.  Howard asserts the significance of five provisions.  First, the General Scope of Work requires Signal's work to be provided "in accordance with Owner's engineering and upgrade specifications, procedures, rules, technical date, plans, drawings, schedules attached hereto as Appendix I, recognized national or international codes and standards" and so forth.  (Pl. Resp. Ex. A 6 (¶2.1), ECF No. 47-1).  Second, Signal is required to have "an exclusive, dedicated full-time safety inspectors team" who "shall attend daily progress meetings . . . with the Owner's Representative." (*Id.* at 9 (¶3.1)). Third, Transocean is authorized to order Signal to suspend work immediately

should Transocean "detect[] any unsafe procedures or Work being conducted. . . ." (*Id*. (¶3.2)).  Fourth, Transocean will inspect Signal's work and accept or reject it. (*Id*. at 12 (¶7.1)).  Finally, Transocean retained the right to access the vessel and Signal's work area at any time.  (*Id*. (¶7.2)).

None of these contractual provisions gives Transocean the right to control the methods and operative details of Signal's work.  *See Cole*, 2007 WL 2475944, *12.  They instead reserve Transocean's right to ensure that it is receiving an acceptable work product in a safe manner from its contractors.  Accordingly, Howard cannot show that Transocean violated the active control duty.

<u>The Duty To Intervene</u>:

The duty to intervene is an exception to the general rule that a vessel owner does not owe a duty to discover dangerous conditions that develop within the confines of operations assigned to a stevedore.  *Futo*, 742 F.2d at 213-14.  To establish a duty to intervene, the plaintiff must first show that the vessel owner was actually aware of the dangerous condition.  *Helaire v. Mobil Oil Co.,* 709 F.2d 1031, 1039–40 (5th Cir.1983) ("[A]ctual, not constructive, knowledge is mandated by the Supreme Court's *Scindia* requisites for liability under § 905(b)...."). *Fontenot v. McCall's Boat Rentals, Inc.*, 227 F. App'x at 404.  The mere presence of the vessel's representatives on the ship does not prove knowledge of a dangerous condition.  *Casaceli v. Martech Int'l, Inc.,* 774 F.2d 1322, 1330 (5th Cir. 1985).

Howard has produced no evidence that Transocean was actually aware of the

unsafe condition of the scaffolding, while Transocean has shown that Signal inspected the scaffolding on the day of the injury and noted no deficiencies. Howard also testified that when he saw the scaffolding boards, he thought they seemed safe. "Again, being trained, I looked at them immediately . . . I didn't immediately see any hazards." (Def. Mot. Summ. J. Ex. D 98, ECF No. 44-4). Under these circumstances, Howard cannot show that Transocean violated the duty to intervene.

**IT IS THEREFORE ORDERED AND ADJUDGED** that the Motion [44] for Summary Judgment filed by defendants Transocean UK Limited, Transocean Offshore International Ventures Limited, and Transocean Drilling Offshore S.a.r.l. is **GRANTED**. Plaintiff's claims against these defendants are **DISMISSED**.

**SO ORDERED AND ADJUDGED** this the 18th day of March, 2014.

s/ *Louis Guirola, Jr.*
LOUIS GUIROLA, JR.
CHIEF U.S. DISTRICT JUDGE